# 24-12770

# United States Court of Appeals
*for the*
# Eleventh Circuit

KINSALE INSURANCE COMPANY,

*Plaintiff/Appellant,*

– v. –

VENETIAN HILLS APARTMENTS, LLC, *et al.*,

*Defendants/Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO: 1:21-cv-3214 (Hon. Leigh M. May)

# BRIEF OF APPELLANT

Sina Bahadoran
Andres Cordova
**CLYDE & CO US LLP**
1221 Brickell Avenue
Suite 1600
Miami, FL 33131
(305) 446-2646

Eric P. Benedict
**CLYDE & CO US LLP**
271 17th Street NW
Suite 1720
Atlanta, GA 30363
(404) 410-3150

Jonathan D. Hacker
Joshua Revesz
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
jhacker@omm.com

Lauren Martin
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
(212) 326-2000

*Counsel for Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (JOB333634)

*Kinsale Insurance Company v. Venetian Hills Apartments, LLC, et al.*,
Record No. 24-12770

# CERTIFICATE OF INTERESTED PERSONS AND
# CORPORATE DISCLOSURE STATEMENT

Appellant, through undersigned counsel, files this Certificate of Interested

Persons and Corporate Disclosure Statement, listing the parties and entities

interested in this appeal, as required by Rule 26.1 of the Federal Rules of Appellate

Procedure and Eleventh Circuit Local Rule 26.1-1.

Alloy, Jason S.

Bahadoran, Sina

Bondurant, Mixson & Elmore, LLP

Benedict, Eric Philip

Carol Clark Law

Clyde & Co US LLP

Cordova, Andres

Daniel, Laurie Webb

Del Campo, Matthew Ryan

Grantham, Bryan M.

Gray, Rust, St. Amand, Moffett & Brieske, LLP

Hacker, Jonathan

Hamilton, Alan

Hawkins Parnell & Young LLP

Hinson, Darrell Wayne

Hughes, George

Hughes, Jeanetta

Hughes, Marie

Kinsale Capital Group (KNSL)

Kinsale Insurance Company

Kynes, Leland H.

Martin, Lauren

Martinez, Ana Maria, Hon.

Maughan, John

May, Hon. Leigh Martin

McClung, James B.

McDonald, Skyler G.

Moffett, Matthew G.

O'Melveny & Myers LLP

Ramachandrappa, Naveen

Revesz, Joshua

Robbins, Richard L.

Shiver, Jeff P.

Shiver Hamilton Campbell, LLC

Venetian Hills Apartments, LLC

Webb Daniel Friedlander, LLP

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant Kinsale Insurance Company respectfully requests oral argument in this case. The district court's decision misinterpreted the plain and unambiguous terms of an insurance policy, resulting in improper coverage for a $140 million judgment. Appellant respectfully submits that oral argument will aid the Court in understanding the law and facts that govern this appeal.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................ C1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 3

STATEMENT OF THE ISSUES ....................................................................... 4

STATEMENT OF THE CASE .......................................................................... 4

    A.     Factual Background ............................................................... 4

        1.     George Hughes' Death By Arson ................................. 5

        2.     The Estate's Underlying Lawsuit ................................. 5

        3.     Kinsale' Insurance Policy ........................................... 7

    B.     Course of Proceedings Below ............................................... 8

    C.     Standard of Review .............................................................. 10

SUMMARY OF ARGUMENT ......................................................................... 11

ARGUMENT ................................................................................................. 14

I.     UNDER GEORGIA LAW, INSURANCE POLICIES ARE CONSTRUED ACCORDING TO THEIR ORDINARY MEANING AND AMBIGUITIES MUST BE RESOLVED THROUGH NORMAL TOOLS OF CONTRACT CONSTRUCTION ......................... 15

II.     THE FAILURE-TO-MAINTAIN EXCLUSION UNAMBIGUOUSLY BARS COVERAGE FOR THE UNDERLYING LAWSUIT ........................................................... 18

    A.     The Plain Text Of The Exclusion Bars Coverage For Suits That Allege A Failure To Maintain The Premises In A "Safe" Condition .......................................................... 19

    B.     The Exclusion's Context Confirms Its Application To Any Suit Alleging Any One Of The Listed Defects ........................ 21

    C.     The Supreme Court's Textual Analysis In *Pulsifer* Supports Application Of The Failure-To-Maintain Exclusion Here ................ 24

**Page**

D. Applying The Exclusion In Accordance With Its Plain Meaning Does Not Render The Policy Illusory ...................................................26

III. THE HARMFUL-OR-OFFENSIVE-CONTACT EXCLUSION APPLIES TO BAR COVERAGE ...........................................................30

A. Wheeler's Acts of Arson And Voluntary Manslaughter Resulted In Harmful Contact To Hughes...........................................30

B. The District Court's Contrary Reasoning Ignores The Exclusion's Text.................................................................................32

CONCLUSION ...............................................................................................38

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ace American Ins. Co. v. Wattles*,
930 F.3d 1240 (11th Cir. 2019) ..................................... 15, 16, 17, 18, 21, 24, 25

*Archer W. Contractors, Ltd. v. Estate of Pitts*,
735 S.E.2d 772 (Ga. 2012)..................................................................................16

*Calderon v. Sixt Rent a Car, LLC*,
114 F.4th 1190 (11th Cir. 2024) .......................................................................10

*Carter v. Georgia*,
785 S.E.2d 274 (Ga. 2016)........................................................................... 35, 36

*Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.*,
466 S.E.2d 4 (Ga. 1996)............................................................................... 17, 26

*Cynergy, LLC v. First Am. Title Ins. Co.*,
706 F.3d 1321 (11th Cir. 2013) .......................................................................28

*ECB USA, Inc. v. Chubb Ins. Co. of N.J.*,
113 F.4th 1312 (11th Cir. 2024) .................................................................. 16-17

*Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Ass'n, Inc.*,
654 S.E.2d 207 (Ga. Ct. App. 2007)..................................................................15

*Georgia v. SASS Grp., LLC*,
885 S.E.2d 761 (Ga. 2023)........................................................................... 16, 21

*Hamilton v. Texas*,
676 S.W.2d 120 (Tex. Crim. App. 1984)...........................................................31

*Happoldt v. Georgia*,
475 S.E.2d 627 (Ga. 1996).................................................................................36

*Harden v. State Farm Fire & Cas. Co.*,
605 S.E.2d 37 (Ga. App. 2004)..........................................................................32

*Haynes v. Kingstown Props., Inc.*,
578 S.E.2d 898 (Ga. Ct. App. 2003)..................................................................29

*Hays v. Ga. Farm Bureau Mut. Ins. Co.*,
722 S.E.2d 923 (Ga. 2012).................................................................................32

*Hylor v. United States*,
  896 F.3d 1219 (11th Cir. 2018) ......................................................................31

*Isdoll v. Scottsdale Ins. Co.*,
  466 S.E.2d 48 (Ga. Ct. App. 1995) .................................................................27

*James River Ins. Co. v. Ultratec Special Effects Inc.*,
  22 F.4th 1246 (11th Cir. 2022) ....................................................................3, 8

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ................................................................................. 16, 19

*Lawson v. Bloodsworth*,
  722 S.E.2d 358 (Ga. App. 2012) ....................................................................34

*Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*,
  174 F.3d 653 (5th Cir. 1999) .........................................................................27

*McCullough v. Briarcliff Summit, L.P. II*,
  516 S.E.2d 353 (Ga. Ct. App. 1999) ..............................................................29

*Mesa v. Clarendon Nat'l Ins. Co.*,
  799 F.3d 1353 (11th Cir. 2015) .....................................................................15

*Mount Vernon Ins. Corp. v. Oxnard Hospital Enterprise, Inc.*,
  219 Cal. App. 4th 876 (Cal. Ct. App. 2013) ..................................................34

*Parrish v. Vance*,
  898 S.E.2d 407 (Va. Ct. App. 2024) ..............................................................23

*Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*,
  490 S.E.2d 374 (Ga. 1997) .............................................................................15

*Pulsifer v. United States*,
  601 U.S. 124 (2024) ......................................................................... 12, 24, 25

*Raven Env't Restoration Servs., LLC v. United Nat'l Ins. Co.*,
  489 F. Supp. 3d 1372 (S.D. Fla. 2020) ..........................................................26

*Reed v. Auto-Owners Ins. Co.*,
  667 S.E.2d 90 (Ga. 2008)......................................................................... 36-37

*State Farm Auto. Ins. Co. v. Staton*,
  685 S.E.2d 263 (Ga. 2009)................................................................. 16, 17, 25

*Travelers Indem. Co. of Connecticut v. Richard McKenzie & Sons, Inc.*,
  10 F.4th 1255 (11th Cir. 2021) ......................................................................27

*Truitt Oil & Gas Co. v. Ranger Ins. Co.*,
  498 S.E.2d 572 (Ga. 1998)............................................................................15

*Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*,
  618 S.E.2d 673 (Ga. Ct. App. 2005) .............................................................32

**Statutes**

18 U.S.C. § 3553(f)(1) ......................................................................................24

28 U.S.C. § 1291 .................................................................................................3

28 U.S.C. § 1292(a)(1)........................................................................................3

28 U.S.C. § 1332(a)(1)........................................................................................3

Alaska Stat. Ann. § 34.03.100 .........................................................................22

Conn. Gen. Stat. § 47a-7 ..................................................................................22

Fla. Stat. Ann. § 83.51 .....................................................................................22

Ga. Code Ann. § 13-2-2(4) ...............................................................................24

Ga. Code Ann. § 16-5-2 ............................................................................ 31, 35

Ga. Code Ann. § 44-7-14 ..................................................................................28

Ga. Code Ann. § 51-3-1 ............................................................................. 18, 22

Ga. Code Ann. § 51-9-1 ....................................................................................28

Ga. Code Ann. § 51-9-2 ....................................................................................28

Ga. Code Ann. § 51-10-1 ..................................................................................28

Ga. Code Ann. § 51-10-3 ..................................................................................28

N.C. Gen. Stat. Ann. § 42-42 ...........................................................................22

Nev. Rev. Stat. Ann. §§ 118A.290, 118.355 ...................................................22

Ohio Rev. Code Ann. § 5321.04(A)(3) ............................................................22

Va. Code Ann. § 55.1-1220(A)(2).....................................................................23

Wyo. Stat. Ann. § 1-21-1202............................................................................22

**Rules**

Fed. R. Civ. P. 26(g)(1)(A) .................................................................20

Fed. R. Civ. P. 54(b) ..........................................................................10

**Other Authorities**

Oliver Wendell Holmes, *The Theory of Legal Interpretation*,
    12 Harv. L. Rev. 417 (1899) ...........................................................16

Restatement (Second) of Property § 5.5(1) (Am. L. Inst. Oct. 2024 update)..........22

## INTRODUCTION

George Hughes died in his apartment after an arsonist intentionally set fire to the building. His Estate sued his landlord, Venetian Hills Apartments, LLC ("Venetian Hills"), for failing to maintain the building in a "safe" condition by providing inadequate fire-detection and fire-suppression equipment. The Estate secured a substantial judgment—now subject to appeal—against Venetian Hills in Georgia state court.

This appeal concerns whether Kinsale Insurance Company ("Kinsale") has a duty to defend Venetian Hills in the underlying state court action. Kinsale issued a commercial general liability policy (the "Policy") to Venetian Hills, charging about $100 per apartment in annual premiums. The Policy generally covers claims for bodily injury and property damage arising from Venetian Hills' negligence, but it contains two explicit exclusions barring coverage here. One is a "failure-to-maintain" exclusion that bars coverage for suits alleging that Venetian Hills breached a duty to maintain premises in a condition that is "safe, sanitary, healthy, habitable, and tenantable." The other is a "harmful-or-offensive contact" exclusion, which bars coverage for suits arising out of harmful or offensive contact, "regardless of fault or intent."

The failure-to-maintain exclusion unambiguously bars coverage for the Estate's suit because the suit alleges that Venetian Hills did not keep its premises

1

"safe," thereby breaching its duty to keep premises "safe, sanitary, healthy, habitable, and tenantable."  The district court concluded otherwise because it construed the exclusion to apply only when a suit alleges a failure to comply with *all five requirements at once*, but that construction contravenes the exclusion's plain text, structure, and function.  As a matter of ordinary English usage, the exclusion is implicated whenever the insured allegedly breached *any one* condition—nobody would say a landlord fulfilled its duty to maintain property so long as the property was sanitary, even if it was unsafe.  And indeed, neither Georgia nor any other state recognizes a failure-to-maintain claim requiring a tenant to prove a landlord simultaneously failed to satisfy all five listed conditions.  Accordingly, if the district court were right that *only* such claims trigger the exclusion, the exclusion would have literally no application at all.  By contrast, enforcing the exclusion by its plain terms would give meaning both to the exclusion and to the rest of the Policy's terms, which would still apply to many different statutory and common-law claims against landlords, as well as claims asserting injury from acts of ordinary negligence committed by landlords and their employees.

The failure-to-maintain exclusion on its own precludes coverage, but the harmful-or-offensive-contact exclusion independently bars coverage as well.  That exclusion applies because the Estate's suit alleges that Hughes was killed by the

2

harmful and offensive contact of the arsonist who immolated Venetian Hills' building. In concluding otherwise, the district court simply ignored the policy language. The court found the exclusion inapplicable because the arsonist did not intend to kill Hughes, but the exclusion expressly states that it applies "regardless of fault or intent." That language categorically forecloses coverage regardless of the arsonist's state of mind. And in any event, under Georgia's doctrine of "transferred intent," the arsonist's conviction for voluntary manslaughter—which legally establishes her intent to harm someone—requires treating her actions as if they were intended to harm Hughes.

The Court should apply the plain language of the exclusions and reverse the judgment below.

## JURISDICTIONAL STATEMENT

As Kinsale explained in its response to the Court's jurisdictional questions, this Court has jurisdiction over this appeal. *See* 11th Cir. Doc. 20. The jurisdiction of the district court rests on 28 U.S.C. § 1332(a)(1). The district court entered judgment on August 6, 2024. *See* DE 107. Kinsale filed a timely notice of appeal on August 27, 2024. *See* DE 108. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's judgment is equivalent to an injunction, *see James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1252 (11th

Cir. 2022), and under 28 U.S.C. § 1291, because the order is a final judgment under Federal Rule of Civil Procedure 54(b).

## STATEMENT OF THE ISSUES

1.  Whether policy language excluding coverage for suits alleging a failure to maintain Venetian Hills' premises in a "safe, sanitary, healthy, habitable, and tenantable condition" precludes coverage for a suit alleging that Venetian Hills did not maintain the premises in a "safe" condition.

2.  Whether policy language excluding suits arising out of harmful or offensive contact, "regardless of intent," precludes coverage for a suit alleging that the victim was killed by a fire that was intentionally set by an arsonist who was convicted of voluntary manslaughter for the victim's death.

## STATEMENT OF THE CASE

In this case, Kinsale seeks a declaration that it does not owe a duty to defend its insured, Venetian Hills, against a tort suit filed in DeKalb County (the "Underlying Lawsuit").

### A.    Factual Background

1.    *George Hughes's Death By Arson*

In March 2017, Kamara Wheeler (who is not a party in either lawsuit) intentionally set a fire in an apartment unit within the Venetian Hills complex in Atlanta.  Tragically, the fire spread throughout the building and killed George

Hughes. The medical examiner's report concluded that Hughes died of "[t]hermal injuries and inhalation of produce of combustion"—and, because Wheeler intended to set the fire, the manner of death was ruled a "Homicide." DE 1-1 at 2.

The State of Georgia charged Wheeler in a six-count indictment that included one count of murder, one count of felony murder, and four counts of arson. DE 1-2. In Count 3, the State specifically charged that Wheeler "did unlawfully, by means of fire, knowingly damage . . . the dwelling house of George Hughes, under circumstances that it was reasonably foreseeable that human life might be endangered." DE 1-2 at 2.

Wheeler pleaded guilty to arson and voluntary manslaughter (as a lesser-included offense of murder) and was sentenced to 20 years in prison. DE 98 at 2; DE 1-4 at 1-2.

### 2. *The Estate's Underlying Lawsuit*

Defendant-Appellee Marie Hughes, as executor of George Hughes's estate , sued Defendant-Appellee Venetian Hills Apartments, LLC ("Venetian Hills") in DeKalb County Superior Court. *See* DE 1-5.[1] The Estate's suit asserts claims for wrongful death and negligence and seeks compensatory, consequential, and

---

[1] John Maughan, the owner of Venetian Hills, was a party in both lawsuits. In the federal action, the parties stipulated that Kinsale's claims against Maughan were mooted after Maughan was dismissed from the Underlying Lawsuit. DE 82. The district court dismissed Maughan from the action on that basis. DE 87.

punitive damages for George Hughes's death, injuries, and pain and suffering during the fire. DE 1-5 ¶¶ 36-39.[2] In particular, the Estate alleges that Venetian Hills was liable for George Hughes's death because it failed to provide and maintain fire detection and suppression equipment in the apartment units, and because it failed to warn residents and guests about the lack of fire safety equipment. *Id.* ¶¶ 16-32; DE 1 (Compl.) ¶ 22. The Estate's complaint invokes Georgia Code Annotated § 44-7-13, which provides that "[t]he landlord shall keep the premises in repair," and Georgia Code Annotated § 51-3-1, which similarly provides that an "owner" who "induces or leads others to come upon his premises . . . is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."

In December 2023, a Georgia jury entered a verdict against Venetian Hills. The jury awarded the Estate $140 million in damages. The district court denied Venetian Hills' motions for judgment as a matter of law, for a new trial, and for remittitur. The verdict is now subject to appeal.

---

[2] Although Venetian Hills and the Estate are adverse in the Underlying Lawsuit, in the federal coverage action they are both defendants-appellees. For clarity, Kinsale primarily refers to defendants-appellees as "Venetian Hills" when discussing the parties' arguments and positions.

### 3. *Kinsale's Insurance Policy*

Plaintiff-Appellant Kinsale Insurance Company ("Kinsale") issued a surplus lines, commercial general liability insurance policy to Venetian Hills. *See* DE 1-6. Venetian Hills paid $12,800 annually for this Policy to cover 123 rental units spread across two apartment complexes. *See* DE 94-1 at 2. Under the terms of the Policy, Kinsale agreed to generally cover bodily injury and property damage (DE 1-6 at 1-9), and personal and advertising injury (*id.* at 9-11). Kinsale agreed to cover a maximum of $1 million for each occurrence. *Id.* at 1.

The Policy that Venetian Hills purchased includes a number of exclusions from coverage, two of which are relevant to this appeal. First, the Policy contains a failure-to-maintain exclusion providing that it "does not apply to any claim . . . arising directly or indirectly out of, related to, or, in any way involving," among other things, "[a]ny failure to maintain any premises in, or restore any premises to a safe, sanitary, healthy, habitable, and tenantable condition." DE 1-6 at 51. Second, the Policy contains a harmful-or-offensive contact exclusion, providing that the Policy "does not apply to any claim . . . arising out of, related to, or, in any way involving any actual or alleged assault, battery, harmful or offensive contact, or threat, whether provoked or unprovoked." *Id.* at 40. This "exclusion applies regardless of fault or intent and regardless of the particular cause of action." *Id.*

## B. Course of Proceedings Below

After the Underlying Lawsuit was filed, Kinsale agreed to defend the Estate, subject to a complete reservation of rights. Compl. ¶ 24; DE 81-4 at 3. To vindicate those rights, Kinsale filed this federal declaratory-judgment action seeking a determination that the Policy does not provide coverage for the Underlying Lawsuit. Specifically, Kinsale's complaint asserts that it has no duty to defend and no duty to indemnify Venetian Hills, including based on the two exclusions described above. Compl. ¶¶ 27-31, 36-39.

During discovery in this action, Venetian Hills' attorney acknowledged that Kamara Wheeler started the fire that resulted in Mr. Hughes's death. DE 81-3 at 13:10-13, 13:25-14:3, 15:19-20.

Kinsale moved for summary judgment, arguing that either of the two exclusions vitiates any duty to defend Venetian Hills in the Underlying Lawsuit.[3] Kinsale argued that the Underlying Lawsuit's claims trigger the failure-to-maintain exclusion because the Estate alleges that Venetian Hills failed to equip apartment units with fire detection and suppression equipment. *See* DE 1-5 ¶¶ 16-32. And it

---

[3] The district court previously dismissed the duty-to-indemnify portion of Kinsale's suit without prejudice, concluding that duty-to-indemnify issues were not ripe until the Underlying Lawsuit is resolved. DE 41 at 9; *see James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1252 (11th Cir. 2022) ("[I]nsurers often seek declaratory judgments on their duty to defend and their duty to indemnify at the same time, before the duty to indemnify becomes ripe.").

argued that the Estate's claims also trigger the exclusion for harmful or offensive contact because the fire set by Kamara Wheeler was an act of arson that resulted in George Hughes's death.

The district court denied Kinsale's motion. DE 98. It explained that to determine the scope of an insurance policy's duty to defend, a court must "compare the allegations of [the Underlying Lawsuit's] complaint, as well as the facts supporting those allegations, against the provisions of the insurance contract." *Id.* at 4. And the court stated that ambiguous policy terms are to be construed in favor of the insured. *Id.* at 5.

Having set forth those principles, the court held that neither the failure-to-maintain nor the harmful-or-offensive-contact exclusions unambiguously applied to preclude Kinsale's duty to defend. As to the failure-to-maintain exclusion, the court concluded that the word "and" connecting the various excluded conditions created an ambiguity because the exclusion "could reasonably be construed in at least two ways," so that Venetian Hills' "reasonable" interpretation was entitled to deference. *Id.* at 7. Specifically, the court thought that the "and" could be construed to mean that the insured must have been sued for breaching "each of the listed conditions—safety, sanitation, health, *and* habitability." *Id.* (emphasis in original). According to the court, if the exclusion instead applied to claims

alleging breach of any one condition, it would "exempt most claims arising from Defendant Venetian Hills' ownership of the apartment complex." *Id.* at 7-8.

As to the harmful-or-offensive contact exclusion, the court opined that Wheeler's acts of voluntary manslaughter and arson did not qualify as either assault or battery under Georgia law. *Id.* at 10-11. In the court's view, Wheeler did not form the specific intent to harm Hughes required by those torts because she "did not know George Hughes was in the building" and "did not intend to kill him." *Id.* at 11. The court did not acknowledge the language excluding claims arising from "harmful or offensive contact" (not just assault and battery), or the language making the exclusion applicable "regardless of fault or intent and regardless of the particular cause of action." *Id.* at 10; *see* DE 1-6 at 40.

The court converted its summary-judgment ruling into a partial final judgment over the duty-to-defend claim, *see* Fed. R. Civ. P. 54(b), and Kinsale filed a timely notice of appeal. *See* DE 108.

C. **Standard of Review**

This Court reviews a summary judgment order de novo. *Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1199 (11th Cir. 2024). The Court will "view[] all evidence and draw all reasonable factual inferences in favor of the nonmoving party." *Id.* (quotations omitted) "Summary judgment is appropriate where there

10

are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (quotations omitted).

## SUMMARY OF ARGUMENT

I.  Under Georgia law—which governs this contract dispute—an insurance policy must be construed according to its ordinary meaning.  And courts must apply the usual tools of contract construction before declaring a policy ambiguous.  The so-called "rule of liberal construction of an insurance policy" cannot be used to create an ambiguity where the ordinary analytical tools point to only one reasonable meaning.

II.  The Policy's failure-to-maintain exclusion applies to "any claim . . . arising directly or indirectly out of, related to, or in any way involving . . . [a]ny failure to maintain any premises in, or restore premises to a safe, sanitary, healthy, habitable, and tenantable condition."  DE 1-6 at 51.  The Estate alleges that Venetian Hills caused George Hughes's death by "breach[ing] its duty to . . . keep the Premises safe," including by failing to provide or maintain fire detection and suppression equipment.  DE 1-5 ¶ 23.  That claim directly implicates the exclusion applying to claims "in any way involving . . . [a]ny failure to maintain any premises in . . . a safe . . . condition."  DE 1-6 at 51.  The failure-to-maintain exclusion unambiguously bars coverage of that claim.

A.  The exclusion expressly refers to a duty to maintain property so that it is "safe, sanitary, healthy, habitable, and tenantable."  By its plain terms, if a claim alleges that the property fails any one of the conditions, the claim asserts a breach of the duty and the exclusion is triggered.  On its face, the exclusion cannot plausibly be read as limited only to claims alleging a failure of all five conditions at once.

B.  The context of the exclusion confirms its meaning.  The Policy exclusion mirrors the common law warranty of habitability and the statutes implementing it. Those statutes do not use all five words in the exclusion's failure-to-maintain list; instead, the statutes identify various defects a landlord must avoid.  Kinsale is aware of no statute that requires a plaintiff to demonstrate all five listed criteria in order to hold a landlord liable.  Under Venetian Hills' interpretation, then, the exclusion would never have any application at all—an interpretation that must be avoided.

C.  The court's leap to ambiguity contradicts the Supreme Court's recent ruling in *Pulsifer v. United States*, 601 U.S. 124 (2024).  Assessing arguments very similar to this case, *Pulsifer* holds that multiple possible interpretations of the word "and" do not automatically create ambiguity, and that courts should instead consider the "content" and "context" of the relevant language.  Georgia law compels the same approach—courts must account for the context of words before

12

concluding that they are reasonably susceptible to more than one interpretation. And based on the Policy's text and context, there is only one possible interpretation.

D.  Contrary to the district court's reasoning, this reading does not render the Policy functionally illusory—the Policy still covers various other kinds of negligence suits against landlords and other policyholders.  The fact that it does not cover failure-to-maintain suits is entirely consistent with the Georgia rule that parties are free to insure against some risks while excluding others.  And the fact that Venetian Hills paid such low annual premiums for this surplus lines Policy makes it unsurprising that the Policy provides only limited coverage.

III.  The harmful-or-offensive contact exclusion states that the Policy "[d]oes not apply to any claim . . . for 'bodily injury' . . . arising out of, related to, or, in any way involving any actual or alleged assault, battery, harmful or offensive contact, or threat, whether provoked or unprovoked."  DE 1-6 at 40.  The exclusion "applies regardless of fault or intent and regardless of the particular cause of action."  *Id.*  This exclusion independently excuses Kinsale's duty to defend Venetian Hills.

A.  George Hughes died because he was trapped inside an apartment unit by a fire that Kamara Wheeler set intentionally, for which she later pleaded guilty to arson and voluntary manslaughter.  As Venetian Hills admits, that act was the but-

13

for cause of Hughes's death.  And it was an act of harmful contact: Wheeler intentionally started the fire in a residential building where Hughes was present. By its terms, the harmful-or-offensive-contact exclusion applies.

B.  The district court's contrary holding ignores the plain text of the policy. Relying on the words "assault" and "battery," the court concluded that the exclusion did not apply because Wheeler did not "intend" to harm Hughes.  But the exclusion applies more broadly to all acts of "harmful or offensive contact" and "regardless of fault or intent."  The district court gave no explanation for declining to apply that language.   In any event, Wheeler's conviction for voluntary manslaughter establishes her intent to cause deadly harm as a matter of law, and under Georgia's doctrine of "transferred intent," that intent must be treated as intent to harm Hughes himself, no matter who she actually intended to harm.

## ARGUMENT

Under Georgia law and the plain language of Kinsale's policy, Kinsale has no duty to defend the Underlying Lawsuit.  As explained below, the failure-to-maintain exclusion and the harmful-or-offensive-contact exclusion each independently bars coverage.

**I. UNDER GEORGIA LAW, INSURANCE POLICIES ARE CONSTRUED ACCORDING TO THEIR ORDINARY MEANING AND AMBIGUITIES MUST BE RESOLVED THROUGH NORMAL TOOLS OF CONTRACT CONSTRUCTION**

Georgia law governs this contract dispute. *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015). Under Georgia law, an insurer's duty to defend a lawsuit against an insured is generally determined by comparing the underlying complaint's allegations with the provisions of the insurance policy. *Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Ass'n, Inc.*, 654 S.E.2d 207, 209 (Ga. Ct. App. 2007). If the underlying complaint asserts only claims that, if proven, would fall within the scope of a policy exclusion, there is no duty to defend. *See Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.*, 490 S.E.2d 374, 376 (Ga. 1997).

In *Ace American Ins. Co. v. Wattles*, 930 F.3d 1240, 1252-54 (11th Cir. 2019), this Court summarized Georgia's rules for construing insurance policies. As a general matter, in Georgia as elsewhere, an "insurance policy is a contract and subject to the ordinary rules of contract construction." *Id.* at 1252 (quotations omitted). Like any other contract, when "the policy language is clear and unambiguous, the contract must be enforced according to its plain terms," *id.*, which must be given their "ordinary meaning," *Truitt Oil & Gas Co. v. Ranger Ins. Co.*, 498 S.E.2d 572, 573 (Ga. 1998) (citation omitted). A court thus must consider what the policy terms "would mean to a normal speaker of English in the

15

circumstances in which they were used," *Kisor v. Wilkie*, 588 U.S. 558, 619 (2019) (Gorsuch, J., concurring in the judgment) (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 417-418 (1899) (alterations adopted)), recognizing that "context is a critical determinant of meaning," *Georgia v. SASS Grp., LLC*, 885 S.E.2d 761, 767 (Ga. 2023); *see Archer W. Contractors, Ltd. v. Estate of Pitts*, 735 S.E.2d 772, 777 (Ga. 2012) ("the context in which a contractual term appears *always* must be considered in determining the meaning of the term").

Under these rules, a policy provision is construed against the insurer only if it is "ambiguous," meaning that it is "subject to more than one reasonable interpretation." *Wattles*, 930 F.3d at 1252 (quoting *State Farm Auto. Ins. Co. v. Staton*, 685 S.E.2d 263, 265 (Ga. 2009)). But a policy provision "is not ambiguous" for this purpose merely because it "present[s] a question of construction." *Id.* Rather, a court can find ambiguity only if "an application of the pertinent rules of construction leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties." *Id.* (quotation omitted). In other words, even a "policy which is susceptible to two reasonable meanings" still cannot be deemed ambiguous if the court "can resolve the conflicting interpretations by applying the rules of contract construction." *Id.* (quotations omitted); *see Staton*, 685 S.E.2d at 265; *see also ECB USA, Inc. v.*

16

*Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1326 (11th Cir. 2024) (where court can resolve conflicting interpretations though interpretive canons, "there is no genuine interpretational difficulty, and [court] need not and cannot turn to *contra proferentem*").

"Additionally, ambiguity is not to be created by lifting a clause or a portion of the contract out of context, or by making hypercritical constructions." *Wattles*, 930 F.3d at 1253 (emphasis added and quotations omitted). Rather, "the natural, obvious meaning is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover." *Id.* (quotation omitted). "Put another way, 'the rule of liberal construction of an insurance policy cannot be used to create an ambiguity where none, in fact, exists.'" *Id.* (quoting *Staton*, 685 S.E.2d at 266). The "courts have no more right or power, by construction, to extend the coverage of a policy or to make it more beneficial to the insured than they do to rewrite the contract and increase the coverage." *Id.* (quotations omitted).

These rules apply equally to the interpretation of policy exclusions. "Under Georgia law, an insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law, and it is equally free to insure against certain risks while excluding others." *Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.*, 466 S.E.2d 4, 6 (Ga. 1996). Thus, while an *ambiguous* exclusion is

17

interpreted in favor of the insured, an *unambiguous* exclusion must be enforced in accordance with its plain terms.  *Wattles*, 930 F.3d at 1253.

## II.  THE FAILURE-TO-MAINTAIN EXCLUSION UNAMBIGUOUSLY BARS COVERAGE FOR THE UNDERLYING LAWSUIT

The core of the Underlying Lawsuit is that Venetian Hills caused George Hughes's death by failing to maintain safe premises at the apartment complex.  "At the time of the fire," the Estate's complaint alleges, "Venetian Hills did not have proper fire detection and fire suppression equipment."  DE 1-5 ¶ 2.  The complaint further alleges that the "smoke detectors and/or fire alarms at the Premises, if any, were either non-existent or were not functioning properly at the time of the incident."  *Id.* ¶ 16.  That failure, the Estate contends, contributed to Hughes's death because he was "trapped" inside by the fire.  *Id.* ¶ 2.  Thus, the Estate concludes, Venetian Hills "breached its duty to George Hughes to exercise ordinary care to keep the Premises safe."  *Id.* ¶ 23.

The Estate's complaint also invokes two Georgia statutes addressing the failure to maintain safe premises  *See id.* ¶¶ 31-32.  One statute provides that "[t]he landlord shall keep the premises in repair."  Ga. Code. Ann. § 44-7-13.  Another states that an "owner" who "induces or leads others to come upon his premises . . . is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe."  *Id.* § 51-3-1.  The language in these statutes—"keep[ing] the premises in repair," and "keep[ing] the

premises . . . safe"—confirms that the Estate's suit is premised on Venetian Hills' alleged failure to maintain the property in safe condition.

For the reasons that follow, the failure-to-maintain exclusion unambiguously bars coverage of the Underlying Lawsuit.

**A.     The Plain Text Of The Exclusion Bars Coverage For Suits That Allege A Failure To Maintain The Premises In A "Safe" Condition**

The failure-to-maintain exclusion bars coverage for suits involving "[a]ny failure to maintain any premises in" a particular "condition." DE 1-6 at 51. And the particular condition in which premises must be "maintained" is a condition that is "safe, sanitary, healthy, habitable, and tenantable." *Id*.

A "normal speaker of English," *Kisor*, 588 U.S. at 619 (Gorsuch, J., concurring in the judgment), would understand that a duty to maintain premises in a condition that is "safe, sanitary, healthy, habitable, and tenantable" means a duty to ensure that its property satisfies *each* of the listed requirements. For example, nobody would think the duty had been discharged if the premises were not "safe," so long as they were "sanitary." In other words, property that is not "safe" is plainly *not* property that is "safe, sanitary, healthy, habitable, *and* tenantable." Thus, a suit against a landlord based on any *one* of the five listed defects would allege a breach of the described duty and would fall within the failure-to-maintain

19

exclusion. A claimant need not specifically allege every defect in the list for the exclusion to apply.

A few examples of similar grammatical structures illustrate the point. A soldier under a duty to be "ready, willing, and able to serve" could be discharged solely for being *unwilling* to serve, even though she was *able* to do so. A babysitter who must keep children "warm, happy, and healthy" could be fired for making them miserable, even if she did not make them cold or sick. An attorney with a duty to provide "complete and correct" disclosures, *see* Fed. R. Civ. P. 26(g)(1)(A), could be sanctioned for withholding information, even if everything disclosed were accurate. In none of these cases would a reader of English assume that a breach of duty could be established only if *all* requirements—ready, willing, and able; warm, happy, and healthy; complete and correct—were violated at once. The same is true for the duty referenced in this Policy.

Contrary to the district court's analysis, this reading gives "and" its normal "conjunctive" meaning. DE 98 at 7. In this exclusion, the word "and" does what it usually does: it connects the items in the operative list, making clear that the requisite "condition" must meet *all* of the adjectival requirements, not only one. So if a policyholder is sued on the basis that it failed to maintain its premises in the required "condition"—that is, a condition that is safe, sanitary, healthy, habitable, *and* tenantable—the Policy does not cover that suit. And the Underlying Lawsuit

20

here is exactly that suit: it alleges that Venetian Hills did not maintain "safe" property, *see supra* at 18-19, so the property did not satisfy all the elements of the required condition.

The district court's own recitation of its alternative reading exposes its grammatical weakness. According to the court, while the interpretation described above is possible, it is *also* possible to read the exclusion such that it "only excludes claims alleging that Defendants' premises is unsafe, unsanitary, unhealthy, unhabitable, *and* untenantable." DE 98 at 6-7. But to even posit that alternative construction, the court is forced to change the words of the exclusion ("safe, sanitary, healthy, habitable, and tenantable") to their negatives ("unsafe," "unsanitary," and so on). By contrast, when the exclusion's actual words are read in accordance with their "natural, obvious meaning," *Wattles*, 930 F.3d at 1253 (quotations omitted), the exclusion plainly bars coverage for the Underlying Lawsuit because it clearly alleged the property was not "safe."

### B. The Exclusion's Context Confirms Its Application To Any Suit Alleging Any One Of The Listed Defects

The straightforward, plain-meaning construction of the exclusion is confirmed by its context. *See SASS Grp.*, 885 S.E.2d at 767 ("context is a critical determinant of meaning"); *see also supra* at 16-17.

As the district court recognized, the Policy "mirror[s]" the common law implied warranty of habitability and the statutes implementing it. DE 98 at 9 n.4.

21

The implied warranty of habitability empowers a plaintiff to seek legal redress when a landlord fails "keep the leased property in a condition that meets the requirements of governing health, safety, and housing codes." Restatement (Second) of Property § 5.5(1) (Am. L. Inst. Oct. 2024 update). Those codes and other statutes detailing landlord duties and tenant rights—in Georgia and elsewhere—set forth the elements of the landlord's duty to maintain property. And so far as Kinsale has determined, every statute on the subject describes the duty in terms of only one or two of the defects identified in the Policy's failure-to-maintain exclusion. *See, e.g.*, Ga. Code Ann. § 51-3-1 ("safe"); Alaska Stat. Ann. § 34.03.100 ("fit and habitable" and "clean and safe"); Conn. Gen. Stat. § 47a-7 ("fit and habitable" and "clean and safe"); Fla. Stat. Ann. § 83.51 ("clean and safe"); Nev. Rev. Stat. Ann. §§ 118A.290, 118.355 ("habitable" and "clean [and] sanitary"); N.C. Gen. Stat. Ann. § 42-42 ("habitable"); Ohio Rev. Code Ann. § 5321.04(A)(3) ("safe and sanitary"); Wyo. Stat. Ann. § 1-21-1202 ("safe and sanitary" and "fit for human habitation"); Va. Code Ann. § 55.1-1220(A)(2) ("fit and habitable"). By listing various different defects, the exclusion ensures that coverage is barred for *any* claim that might asserted under any such statute—for example, a claim for breach of the duty to keep premises "fit and habitable" or "clean and sanitary" or "clean and safe" and so on.

22

Perhaps even more significant, Kinsale is aware of no statute, anywhere in the country, that subjects a plaintiff to the outlandish burden of proving that property failed to satisfy all of the five listed criteria at once—to prove, in other words, that the landlord is keeping its premises simultaneously unsafe, unsanitary, unhealthy, untenantable, and unhabitable. That kind of approach was affirmatively *rejected* in *Parrish v. Vance*, 898 S.E.2d 407 (Va. Ct. App. 2024), which addressed a landlord's statutory duty to keep the premises "in a fit and habitable condition," Va. Code Ann. § 55.1-1220(A)(2). The landlord there argued that the tenant was required to prove that the property was *both* unfit *and* unhabitable. 898 S.E.2d at 437. The court rejected that reading, holding that "'fit and habitable' means that all conditions in both definitions must be met." *Id.* at 438. Thus, a tenant can prevail in Virginia simply by showing that the landlord has left the premises unfit or unhabitable; she is not required to prove that both separate defects existed at once. And to Kinsale's knowledge, no court in any jurisdiction has adopted a different rule, much less required a tenant to prove that a property simultaneously suffers from *all five* defects set out in Kinsale's Policy.

The absence of any such claim speaks volumes about the meaning of the exclusion: if the exclusion applied only to claims asserting all five defects at once—as the district court concluded—it would serve no purpose whatsoever. Put differently, it would exist solely to exclude coverage for a category of claims that

23

does not exist anywhere in the United States.  And an interpretation that results in such significant, inexplicably meaningless surplusage must be rejected.  *See Wattles*, 930 F.3d at 1253-54 (court must seek construction of policy that "will give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage" (quotations omitted)); Ga. Code Ann. § 13-2-2(4) ("[t]he construction which will uphold a contract in whole and in every part is to be preferred").

### C.  The Supreme Court's Textual Analysis In *Pulsifer* Supports Application Of The Failure-To-Maintain Exclusion Here

The foregoing textual analysis is strongly supported by the Supreme Court of the United States' recent decision in *Pulsifer v. United States*, 601 U.S. 124 (2024), a case construing statutory language analogous to the language of the failure-to-maintain exclusion.  The language at issue in *Pulsifer* appeared in a criminal sentencing reduction provision that applied only to a defendant who "does not have" three types of prior offenses, set out in a list separated by the word "and."  18 U.S.C. § 3553(f)(1).  Specifically, the statute stated that a defendant could qualify for the reduction if the defendant lacked (1) more than a certain number of "criminal-history points"; (2) a certain prior "offense," "and" (3) a certain prior "violent offense."  *Id.*

Like Venetian Hills here, the defendant in *Pulsifer* argued that the use of "and" in the list created a facial ambiguity:  the sentencing reduction could apply

either when a defendant lacked *all* the specified prior offenses (the government's

position), or when a defendant lacked *any one* of the offenses (the defendant's

position).  Because of that facial ambiguity, the defendant urged, the default "rule

of lenity" applied, requiring the ambiguity to be resolved in favor of the defendant.

*Pulsifer*, 601 U.S. at 133-34.

The Supreme Court disagreed.  According to the Court, the fact that "and"

gave rise to two "grammatically permissible" readings did not suffice to create an

insurmountable ambiguity requiring resort to the tie-breaking rule of lenity.  *Id.* at

152.  Rather, the language first had to be construed in light of its "content" and

"context," and doing so left only one "plausible construction"—the government's

reading of the statute.  *Id.* at 142.

The Supreme Court's interpretive approach in *Pulsifer* mirrors the approach

mandated by Georgia's policy construction rules.  As this Court recognized in

*Wattles*, 930 F.3d at 1252-53, those rules require courts to try to resolve apparent

textual ambiguities through ordinary interpretive tools—including especially the

context in which the language is used—before resorting to the tie-breaking rule of

liberal construction in favor of the insured, *see Staton*, 685 S.E.2d at 265; *see also*

*supra* at 15-18.  Accordingly, just as in *Pulsifer*, even if there are two

"grammatically possible" readings of the failure-to-maintain exclusion, it is not

"genuinely ambiguous" if the "content" and "context" of the language reduce the

25

"two grammatical possibilities to just one plausible construction." 601 U.S. at 133, 140, 152. And as shown above, only one construction of the exclusion is consistent with ordinary English usage and gives the exclusion operative meaning: the exclusion is not limited to suits seeking to prove that the property simultaneously fails all five listed conditions, but bars coverage for any suit alleging that the property fails any one of the specified criteria.

D. **Applying The Exclusion In Accordance With Its Plain Meaning Does Not Render The Policy Illusory**

Finally, the district court asserted that if the failure-to-maintain exclusion applied to any claim alleging any one of the listed defects, the exclusion would "exempt most claims arising from" property ownership. DE 98 at 7-8 & n.2. That assertion is both irrelevant and exaggerated.

To start, even if it were true, it would not matter that the failure-to-maintain exclusion would "exempt most claims" brought against Venetian Hills. In Georgia as elsewhere, parties are "free to insure against certain risks while excluding others." *Cont'l Cas. Co.*, 466 S.E.2d at 6. In particular, a "surplus lines" policy like Venetian Hills' policy is *supposed* to be very narrow: "The surplus lines insurance market exists to assume risks that licensed insurance companies decline to insure or will only insure at a very high price, with many exclusions, or with a very high deductible." *Raven Env't Restoration Servs., LLC v. United Nat'l Ins. Co.*, 489 F. Supp. 3d 1372, 1375 (S.D. Fla. 2020). If Venetian Hills cannot obtain

26

insurance from an admitted insurer and chooses to purchase a surplus lines policy with limited coverage, that is not a reason to read the Policy in Venetian Hills' favor.

In fact, it is hardly surprising that the Policy excludes a significant category of potential liability against Venetian Hills. The annual premium for the Policy was very low: $12,800 annually, or approximately $100 for each of Venetian Hills' 123 apartment units. DE 94-1; *see supra* at 7. Those "premiums presumably [were] reduced to reflect the limited coverage" available under the Policy. *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 660 (5th Cir. 1999). If Venetian Hills wanted coverage for failure-to-maintain claims, it could have negotiated to eliminate the exclusion in exchange for a higher premium, or it could have paid for specific coverage for such claims under another policy. But having made the choices it did, it cannot rewrite the Policy based on complaints about limited coverage. *See Travelers Indem. Co. of Connecticut v. Richard McKenzie & Sons, Inc.*, 10 F.4th 1255, 1267 (11th Cir. 2021) ("[W]e have no authority to rewrite insurance contracts to cure buyer's remorse.").

To be sure, insurance policies should not be read to make coverage "illusory." *Isdoll v. Scottsdale Ins. Co.*, 466 S.E.2d 48, 50-51 (Ga. Ct. App. 1995). But the district court rightly declined to hold that Kinsale's plain-meaning construction would leave Venetian Hills without any coverage. *See* DE 98 at 8 n.2.

As this Court has recognized, an insurance policy is illusory only if it "completely nullifies" coverage. *Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1327 (11th Cir. 2013). And properly construed, the Policy here in fact covers many potential claims unrelated to Venetian Hills' duty to maintain.

There are many situations in which a plaintiff may assert claims against a landlord for harms unrelated to its failure to maintain its premises. For example, Georgia law distinguishes between suits over "damages arising from defective construction" and suits "arising from the failure to keep the premises in repair." Ga. Code Ann. § 44-7-14. The former class of suit falls entirely outside of the failure-to-maintain exclusion. Numerous other claims can be asserted against landlords with no connection to the duty to maintain, including claims for invasion of privacy, *id.* § 51-9-1; interference with the tenant's right of access to and possession of rental property, *id.* § 51-9-2; interference with the tenant's enjoyment of personal property, *id.* § 51-10-1; and damage to a tenant's personal property, *id.* § 51-10-3.

Landlords also can be sued for their own ordinary acts of negligence that do not relate to the condition in which their premises are maintained. For example, if a landlord's employee accidentally injures a tenant or damages her property while performing maintenance or repair work, the landlord would be liable outside of the failure-to-maintain framework. The same is true for a landlord who negligently

28

locks a tenant out of her unit—any alleged loss would fall outside the exclusion.

And the same is true for a landlord who negligently disseminates a tenant's private

information—a claim that is specifically contemplated by the Policy's coverage of

liability for "personal and advertising injury." DE 1-6 at 9. In all of these cases,

the landlord committed a negligent act, rather than the sort of negligent omission

that is the hallmark of a failure-to-maintain claim.[4]

All that said, there are certainly failure-to-maintain claims against landlords

that will not be covered by the Policy. *See*, *e.g.*, *Haynes v. Kingstown Props., Inc.*,

578 S.E.2d 898, 900 (Ga. Ct. App. 2003); *McCullough v. Briarcliff Summit, L.P.*

*II*, 516 S.E.2d 353, 354 (Ga. Ct. App. 1999). After all, the whole point of the

exclusion is to bar coverage for such claims, limiting the Policy's scope in

exchange for low premiums. Again, the question is not whether the Policy covers

all or even most potential claims against Venetian Hills. *See supra* at 26-27. The

point is that Kinsale's reading would exclude some claims and include others,

---

[4] Notably, landlords are not the only potential buyers of Kinsale's insurance
policies. The Policy is a "commercial general liability" policy—it is not tailored
specifically for businesses renting out apartment units. DE 1-6 at 1. And for the
overwhelming majority of businesses, failure-to-maintain suits are an afterthought:
companies that manufacture products, for example, are far more concerned about
products liability or negligence litigation than any sort of failure-to-maintain
theory. For those companies, therefore, Kinsale's exclusion is relatively
inconsequential. Even if it bars a higher percentage of claims against landlords
specifically, the plain meaning of the exclusion's text should not change depending
on the policyholder to whom it applies.

while Venetian Hills' reading would exclude *no claims at all*. *See supra* at 22-23. The former interpretation makes sense of the Policy, and the latter does not. The district court accordingly erred in finding that the Underlying Lawsuit does not trigger the failure-to-maintain exclusion.

## III. THE HARMFUL-OR-OFFENSIVE-CONTACT EXCLUSION APPLIES TO BAR COVERAGE

The harmful-or-offensive-contact exclusion bars coverage of "any claim . . . for 'bodily injury' . . . arising out of, related to, or, in any way involving any actual or alleged assault, battery, harmful or offensive contact, or threat, whether provoked or unprovoked." DE 1-6 at 40. The exclusion expressly "applies regardless of fault or intent and regardless of the particular cause of action." *Id.* This exclusion applies squarely to this action, where the undisputed facts show that George Hughes died because Kamara Wheeler intentionally set a fire that caused his death. The district court's contrary conclusion, which turns on the theory that Wheeler did not "intend" to harm Hughes, runs contrary to the specific language in the Policy stating that questions of intent are irrelevant to the exclusion.

### A. Wheeler's Acts of Arson And Voluntary Manslaughter Resulted In Harmful Contact To Hughes

The Fulton County Medical Examiner determined that George Hughes died from "[t]hermal injuries and inhalation of products of combustion." DE 1-1 at 2. The examiners concluded the manner of death was "[h]omicide." *Id.* Kamara

Wheeler was charged with murder, felony-murder, and arson, and ultimately pleaded guilty to and was convicted of voluntary manslaughter in violation of Georgia Code Ann. § 16-5-2 and first degree arson in violation of Georgia Code Ann. § 16-7-60. *See* DE 81-6.

That act of deadly arson involved harmful contact to George Hughes. "One who starts a fire . . . necessarily exerts a physical force—the fire." *Hamilton v. Texas*, 676 S.W.2d 120, 121 (Tex. Crim. App. 1984) (en banc). And that physical force made contact with and killed George Hughes. Wheeler's voluntary-manslaughter conviction establishes that she "cause[d] the death of another human being under circumstances which would otherwise be murder" except that she "act[ed] solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation." Georgia Code Ann. § 16-5-2. And murder is a quintessential act of harmful contact because it "requires the . . . use of physical force that is capable of causing pain or injury." *Hylor v. United States*, 896 F.3d 1219, 1220 (11th Cir. 2018).

The surrounding language in the exclusion resolves any remaining doubt. The Policy excludes all claims "arising out of, related to, or, in any way involving" harmful or offensive contact. DE 1-6 at 40. And "when the phrase 'arising out of' is found in an exclusionary clause of an insurance policy," Georgia courts apply the "but for" test "traditionally used to determine cause-in-fact for tort liability."

*Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 722 S.E.2d 923, 927 (Ga. 2012).  That

means that "[c]laims arise out of [t]he excluded conduct when 'but for' that

conduct, there could be no claim against the insured."  *Id.*  As a jury of her peers

concluded, Wheeler's act of voluntary manslaughter was unquestionably the but-

for cause of George Hughes's death, and thus is the but-for cause of the Estate's

suit against Venetian Hills.  The harmful-or-offensive-contact exclusion therefore

applies.[5]

**B.**     **The District Court's Contrary Reasoning Ignores The Exclusion's Text**

The district court's contrary conclusion ignores the express language of the

harmful-or-offensive contact exclusion.  According to the district court, the

exclusion does not apply because Wheeler's admitted acts of voluntary

manslaughter and arson did not legally constitute either "assault" or "battery,"  DE

98 at 11.  In the court's view, assault and battery each require an intent to make

physical contact with a person, and as the court construed her voluntary

---

[5] The district court properly "assume[d]" that it could consider the facts of Wheeler's criminal arson.  DE 98 at 10-11 & n.5.  Because "it is undisputed that the alleged facts provided the basis for a guilty plea" by Wheeler, that plea is "sufficient to establish a prima facie case that [Kinsale] had no duty under the terms of the policy to provide coverage or a defense."  *Harden v. State Farm Fire & Cas. Co.*, 605 S.E.2d 37, 38 (Ga. App. 2004).  And Venetian Hills' attorney separately acknowledged in this action that Wheeler started the fire that resulted in Mr. Hughes' death.  *See supra* at 8.  That fact is therefore "undisputed" and may be properly considered in assessing the duty to defend.  *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 618 S.E.2d 673, 679 (Ga. Ct. App. 2005).

manslaughter and arson convictions, neither was based on an intent to make physical contact with Hughes. "Indeed," the court emphasized, "the transcript of Wheeler's sentencing hearing—produced by Plaintiff—indicates that Wheeler did not know George Hughes was in the building on the day of the fire and did not intend to kill him." *Id.*

That analysis is wrong for several reasons.

First, the district court's reading overlooks the exclusion's explicit proviso making it applicable "regardless of fault or intent." DE 1-6 at 40. Under that plain language, it is irrelevant whether Wheeler intended to harm Hughes—what matters is that she committed an offensive act of violence that was in fact harmful to him. In other words, even if she was not at "fault" in the sense that she did not have the specific "intent" to harm Hughes, the Estate's claim triggers the exclusion because the claim involves a violent act that indisputably resulted in harmful and offensive contact. Kinsale emphasized the key "regardless of fault or intent" proviso below, DE 83-1 at 11, but the court ignored it entirely.

Second, and relatedly, the court's singular focus on the torts of "assault" and "battery" ignores the Policy's broader exclusion of claims involving any form of "harmful or offensive contact." DE 1-6 at 40. That language plainly extends beyond particular torts with an intent requirement. Wheeler committed a violent act resulting in harmful—indeed deadly—contact with Hughes. Regardless

33

whether that violent act technically also qualifies as assault or battery, it enough that the violent act involved offensive and harmful contact with Hughes.

Third, the court obviously erred in suggesting that arson categorically does not constitute harmful or offensive contact because it involves contact with a structure rather than a person. DE 98 at 11. It is settled that using a physical intermediary—such as a chair—to make offensive or harmful contact with another still qualifies as contact for torts like battery. *See, e.g.*, *Lawson v. Bloodsworth*, 722 S.E.2d 358, 359-60 (Ga. App. 2012) (tortfeasor who "intentionally threw a chair" committed battery). The result is no different if one uses explosives or fire to cause the harm, as in *Mount Vernon Ins. Corp. v. Oxnard Hospital Enterprise, Inc.*, 219 Cal. App. 4th 876, 878 (Cal. Ct. App. 2013) (battery exclusion triggered where tortfeasor threw "a flammable liquid on [clamant] and set her on fire," even though no "direct 'body-to-body' contact" occurred). To be sure, the claimant in *Oxnard* was struck directly by the flammable liquid, but there should be no legal difference when the tortfeasor intentionally sets a person's immediate surroundings ablaze. Either way, the tortfeasor is simply using fire as the medium of offensive and harmful contact, which is what triggers the exclusion.

Finally, even if Wheeler's intent were relevant under the exclusion, the court erred in focusing solely on whether Wheeler subjectively intended to contact and harm Hughes himself. Even assuming Wheeler was unaware of Hughes' presence

34

in the building, her voluntary manslaughter conviction inherently establishes intent to kill through her arson—albeit under provocation, as she claimed. *See* Ga. Code Ann. § 16-5-2 ("[a] person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person"). Under Georgia law, "a defendant *must* have an intent to kill in order for voluntary manslaughter to serve as a potential lesser included offense of malice murder." *Carter v. Georgia*, 785 S.E.2d 274, 277 (Ga. 2016) (emphasis added).[6] Because Wheeler was explicitly convicted of voluntary manslaughter as lesser-included to her charge of malice murder—*not* to her

---

[6] Malice murder can involve either an "express or implied intent to kill." *Carter*, 785 S.E.2d at 277. Express malice is a "deliberate intention unlawfully to take the life of another human being." Ga. Code. Ann. § 16-5-1(b). Implied malice exists "where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." *Id.* Both express and implied malice murder are intentional killings; voluntary manslaughter differs only in that perpetrator is considered less culpable because of the provocation, but the killing is still considered intentional. In other words, "in order for a person to be found guilty of voluntary manslaughter as a lesser included offense of malice murder, that person must act with the intent to kill, but must also have taken his or her actions 'as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.'" *Carter*, 785 S.E.2d at 277 (quoting Ga. Code § 16-5-2).

35

separate charge of felony murder, DE 1-4 at 1—her intent to kill by setting the residential building ablaze is established as a matter of law.[7]

Further, under Georgia's doctrine of "transferred intent," when a defendant commits an act intending to harm someone, but accidentally harms another person, the defendant remains liable for the act as if the original target had been harmed as intended. *See Happoldt v. Georgia*, 475 S.E.2d 627, 629 (Ga. 1996) ("Under the doctrine of transferred intent, when an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it." (quotation and alteration omitted)). Accordingly, the intent to harm inherent in her voluntary manslaughter conviction must be treated legally as an intent to harm Hughes, no matter whom she subjectively intended to harm.

For all these reasons, the court erred in refusing to apply the harmful-or-offensive-contact exclusion to bar coverage for the Estate's claim arising from Wheeler's admitted acts of voluntary-manslaughter-by-arson. At bottom, the Policy's language—which of course is controlling, *see Reed v. Auto-Owners Ins.*

---

[7] Intent to kill is *not* an element of voluntary manslaughter when it is lesser-included to felony murder, *see Carter*, 785 S.E.2d at 277, but Wheeler's felony murder charge was dismissed nolle prosequi, with no conviction for any lesser-included offense, DE 1-4 at 1.

*Co.*, 667 S.E.2d 90, 92 (Ga. 2008)—is crystal clear that the exclusion applies to claims arising from harmful or offensive contact "regardless of intent" and "regardless of the particular cause of action." DE 1-6 at 40. That language is unambiguous, and the district court was wrong to ignore it.

**CONCLUSION**

For the foregoing reasons, the judgment should be reversed.

Respectfully submitted,

By:    */s/ Jonathan D. Hacker*

|  |  |
|---|---|
| Sina Bahadoran | Jonathan D. Hacker |
| Andres Cordova | Joshua Revesz |
| Clyde & Co US LLP | O'Melveny & Myers LLP |
| 1221 Brickell Avenue | 1625 Eye Street, NW |
| Suite 1600 | Washington, DC 20006 |
| Miami, FL 33131 | (202) 383-5300 |
| (305) 446-2646 | jhacker@omm.com |
|  |  |
| Eric P. Benedict | Lauren Martin |
| Clyde & Co US LLP | O'Melveny & Myers LLP |
| 271 17th Street NW | 1301 Avenue of the Americas |
| Suite 1720 | Suite 1700 |
| Atlanta, GA 30363 | New York, NY 10019 |
| (404) 410-3178 | (212) 326-2000 |

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 8,690 words.  The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6), as it has been prepared using Microsoft Word in a proportionally-spaced 14-point Times New Roman typeface.

/s/ Jonathan D. Hacker
Jonathan D. Hacker

**CERTIFICATE OF SERVICE**

I certify that on December 30, 2024 this document was filed via the

CM/ECF system. I further certify I am unaware of any non-CM/ECF participants.

*/s/ Jonathan D. Hacker*
Jonathan D. Hacker